# STATE OF MICHIGAN

# COURT OF APPEALS

SUTTONS BAY YACHT VILLAGE
CONDOMINIUM ASSOCIATION and MARSHA
HOLTZ,

UNPUBLISHED
May 19, 2016

Plaintiffs/Counter-Defendants-
Appellants,

v

No. 325327
Leelanau Circuit Court
LC No. 2013-009207-CH

BOARD OF REPRESENTATIVES OF PORT
SUTTON COMMUNITY, PORT SUTTON
CONDOMINIUM ASSOCIATION, SUTTONS
BAY YACHT CLUB CONDOMINIUM
ASSOCIATION, BAY CLIFF ESTATES
CONDOMINIUM ASSOCIATION, JOHN
NEHIL, ERIC RAY, and SHELLY DENNY,

Defendants/Counter-Plaintiffs-
Appellees,

and

D. DOUGLAS ALEXANDER,

Defendant-Appellee.

Before: O'BRIEN, P.J., and K. F. KELLY and FORT HOOD, JJ.

PER CURIAM.

This dispute involves a community of four condominium associations governed by an informal board made up of the presidents of the individual condominium associations. Plaintiffs Suttons Bay Yacht Village Condominium Association (Yacht Village) and Marsha Holtz, Yacht Village's president, filed suit against defendants, the other condominium associations and their presidents—Port Sutton Condominium Association (Port Sutton), Suttons Bay Yacht Club Condominium Association (Yacht Club), Bay Cliff Estates Condominium Association (Bay Cliff), John Nehil, Eric Ray, and Denny Shelly—as well as the informal board, Board of Representatives of Port Sutton Community (the Board), contesting the Board's legal existence and authority to take certain actions. Additionally, plaintiffs' complaint included allegations

-1-

against defendant D. Douglas Alexander, an attorney who has represented the Board since the 1990s. Plaintiffs alleged that Alexander violated both the rules of professional conduct and state and federal debt collection acts in his representation of both plaintiffs and defendants. Plaintiffs appeal as of right the trial court's order dismissing their complaint in its entirety, entering a judgment of no cause of action in favor of defendants and Alexander, and declaring legal and valid certain documents that established the Board and the Board's subsequent actions.

## I. BACKGROUND

The Port Sutton Community was established in 1982 pursuant to a declaration of covenants, conditions, and restrictions that was recorded in the Leelanau County Records. The Community was to consist of "one or more separate residential condominium projects" with all owners within the Community utilizing, maintaining, and supporting certain easements, improvements, and amenities comprising "Community Areas."[1] Maintenance and capital improvements were to be covered by annual and special assessments to each property owner in the Community. Of the 160 maximum allowable dwelling units, 109 were developed within four separate condominium associations: Port Sutton, Yacht Club, Yacht Village, and Bay Cliff.[2]

Pursuant to the declaration, there were means in which residents of the Port Sutton Community could assign and delegate their rights, duties and responsibilities under the declaration, including assignment "to the condominium associations collectively of which the Owners of all Dwelling Units in the Port Sutton Community may be members." On December 26, 1996, the declarant[3] executed an assignment, effective January 1, 1997, pursuant to this section. The assignment provided:

> Each Association shall appoint one voting representative to the informal Board of Representatives of the Port Sutton Community. Each voting representative shall be entitled to cast that number of votes which represents the number of dwelling units within the Condominium represented by him/her; provided, that if no dwelling units have yet been completed in the Condominium represented, the voting representative shall be entitled to cast one vote.

As a result of the assignment, the Board was created in 1997 and assumed responsibility for governing the Port Sutton Community. In September 1997, the Board met and noted that "[a]ll

---

[1] "Community Areas" was defined to possibly, but "not necessarily include or be limited to the main connector road . . ., gate houses . . ., a security system, a water retention basin, a greenbelt area, a septic system, private water supply system, irrigation and street lighting systems . . . ."

[2] A fifth condominium association, Harbor Heights Condominium Association, was originally a member of the Community, but was never developed and dissolved in 2011 for non-filing of annual reports.

[3] The declaration was executed by Earl Ennis Building and Development Company, Inc. The company subsequently assigned its interests to Harbor Club Properties, Inc.

associations have co-owner and Board majority approval of RESOLUTIONS appointing current board members to act on their behalf." Over time, the declaration was amended multiple times, both before and after the assignment became effective.

Beginning in 2012, disputes between Yacht Village and the Board began to arise over nonpayment of an annual maintenance assessment; Yacht Village eventually paid the 2012 assessment. In 2013, Yacht Village again failed to pay the assessment, and also objected to a proposed supplement to the declaration that would establish Community Area easements for tree trimming and removal. Although Holtz, as Yacht Village's president, voted against the supplement, it was passed with approval from Yacht Club, Bay Cliff, and Port Sutton. The disputed supplement was recorded on August 12, 2013. Shortly thereafter, Alexander received correspondence from plaintiffs' counsel disputing the Board's authority.

On December 13, 2013, Yacht Village and Holtz, both individually, and on behalf of all dwelling unit owners in the Port Sutton Community, filed suit against defendants and Alexander alleging multiple counts stemming from the enactment and recording of all supplemental declarations after the assignment; the enactment and collection of various assessments; and Alexander's actions with respect to providing legal counsel to the separate associations and the Board. The association defendants counterclaimed, seeking, among other things, a declaratory judgment that the assignment was proper, the Community's form of government was consistent with the declaration and Michigan law, and the actions of the Board were legally valid and in conformity with the declaration. The trial court eventually granted defendants' summary disposition in regard to all claims, and dismissed plaintiffs' entire complaint with prejudice. The trial court then entered an order granting declaratory judgment in favor of defendants, and Yacht Village was "permanently enjoined from taking action that interferes with or prevents the Board[]'s proper administration or enforcement of the Supplemental Declarations." Plaintiffs now appeal.

II. ANALYSIS

On appeal, plaintiffs argue that the trial court erred in granting summary disposition. We review a trial court's decision on a motion for summary disposition de novo. *Auto Club Group Ins Co v Burchell*, 249 Mich App 468, 479; 642 NW2d 406 (2002).

A. AN UNINCORPORATED ASSOCIATION IS A LEGAL ENTITY

Plaintiffs first contend that the trial court erred in concluding that an unincorporated voluntary association is a legal entity. We disagree.

Plaintiffs concede that various statutes mention "unincorporated association" or "voluntary association." Plaintiffs contend, however, that a voluntary unincorporated association is not a legal entity because neither MCL 600.2051, nor any other Michigan statute, expressly declares an unincorporated association to be "an 'artificial person', *i.e.* a legal entity." Contrary to plaintiffs' argument, we hold that Michigan caselaw and statutory law support the conclusion that an unincorporated association is a legal entity.

In *Mason v Finch*, 28 Mich 282 (1873), the Supreme Court considered a case in which an "unincorporated society" was argued to have merged into a subsequently created corporation. *Id.* at 283. A dispute arose over whether certain property was owned by the corporation or the association. *Id.* The Court concluded that because the members of the association had not unanimously agreed to become a corporation, and the association had continued to exist, holding separate meetings, officer, property, and members, the corporation and the association were not legally identical and, therefore, the property remained with the unincorporated society. *Id.* at 284-285. Moreover, it held that "[i]t would not be competent for the Legislature, and no attempt has been made by it, as we think, to compel any person or society to become incorporated without its assent." *Id.* at 285. Thus, under *Mason*, unincorporated associations can hold property and exist separate and apart from corporations that are subsequently created by members of the association.

The Supreme Court reaffirmed this holding in *Detroit Society for the Study & Prevention of Tuberculosis v Detroit Society for the Study & Prevention of Tuberculosis*, 167 Mich 102, 132 NW 547 (1911), when it concluded that certain funds donated to the unincorporated organization continued to be owned by that organization and not the subsequently created corporation and that the association could not be deemed to have merged into the corporation without unanimous assent of the association. *Id.* at 106. In follows that, in each case, for an unincorporated association to hold property and to be deemed to exist separate and apart from a corporation, it must legally exist. We further note, with approval, that in its opinion, the trial court referenced many examples of Michigan caselaw in which unincorporated voluntary associations "have legally owned property, maintained bank accounts, transacted business, entered into contracts, served as trust beneficiary, sought declaratory rulings, challenge tax decisions, obtained injunctive relief, and enforced building restrictions."

Turning to Michigan statutes, MCL 600.2051(2) provides, "A partnership, partnership association, or any unincorporated voluntary association having a distinguishing name may sue or be sued in its partnership or association name, or in the names of any of its members designed as such or both." MCL 339.720(1)(e), part of the Occupational Code, MCL 339.101 *et seq*., which deals with public accounting, defines "firm" as "a corporation, partnership, limited liability company, unincorporated association, sole proprietorship operating under an assumed name, or other legal entity." (Emphasis added.) The inclusion of "or other legal entity" at the end of the list means that all of the prior examples, including "unincorporated association" are also legal entities.

This conclusion is both consistent with and buttressed by MCL 445.902(1)(d), which defines "person" for purposes of the Michigan Consumer Protection Act, MCL 445.901 *et seq*., as "a natural person, corporation, limited liability company, trust, partnership, incorporated or unincorporated association, or other legal entity." MCL 15.304(3), involving whether contracts between legislators and the state or political subdivisions constitute a conflict of interest, expressly notes that contracts between the state or a political subdivision and "[a] firm, partnership, or other unincorporated association, in which a legislator or state officer is a partner, member, or employee" do not create a substantial conflict of interest. MCL 15.304(3)(b)(*ii*). Cf. MCL 380.620(5)(b)(*ii*) (for school board members and administrators). Such a statement requires that unincorporated associations have the capacity to contract and, therefore, must be

legal entities. See also MCL 125.2812 (including unincorporated associations in the definition for "applicant").

Most notably, MCL 450.2313 provides that, unless expressly prohibited by a corporation's bylaws or articles of incorporation, an unincorporated association "may be a shareholder or member of a corporation," MCL 450.2313(1), and "possesses and may exercise all the rights, powers, privileges, and liabilities of individual shareholders or members," MCL 450.2313(2). Again, an unincorporated association must be a legal entity to be able to do so.

We also note that when MCL 440.3110 of the Uniform Commercial Code was revised, one of the reasons was cited as:

> Vestigial theories relating to the lack of "legal entity" of partnerships and various forms of unincorporated associations—such as labor unions and business trusts— make it the part of wisdom to specify that instruments made payable to such groups are order paper payable as designated and not bearer paper (subsection (1)(g)). As in the case of incorporated associations, any person having authority from the partnership or association to whose order the instrument is payable may indorse or otherwise deal with the instrument. [Comment 4, Comments of National Conference of Commissioners and American Law Institute.]

The fact that these theories are referred to as "vestigial," *i.e.* a remaining trace amount or functionless, suggests that such references in older caselaw are simply remnants of legal theories to which modern caselaw and statutes no longer adhere. Considering the language and implications of both the cited caselaw and statutes, the trial court did not err in concluding that an unincorporated voluntary association was a legal entity.

## B. THE BOARD IS AN UNINCORPORATED VOLUNTARY ASSOCIATION

Plaintiffs next contend that the appointment of four people to an informal board did not transform the Board into an unincorporated voluntary association. Plaintiffs note that all Michigan non-profit corporations are required to have a formal board of directors, but those boards are not associations or entities separate and apart from the organization. However, the trial court's decision that the Board in this case was an unincorporated voluntary association did not transform every board ever created into such an organization, nor did its legal reasoning require such a conclusion. Instead, whether any group constitutes an unincorporated association requires not simply agreement in the description as such, but "associated, mutual, action of individuals." *Walters v Pittsburgh & Lake Angeline Iron Co*, 201 Mich 379, 383-384; 167 NW 834 (1918).

This Court previously held " 'Association,' not being a technical word or term of art, must be given its customary or ordinary meaning when interpreted by this Court for purposes of subsection (a)." *John v John*, 47 Mich App 413, 416; 209 NW2d 536 (1973). The Court went on to define association as: "The act of a number of persons in uniting together for some special purpose or business. The persons so joining. It is a word of vague meaning used to indicate a collection of persons who have joined together for a certain object." *Id*. at 418, quoting Black's Law Dictionary (4th ed), p 156. Plaintiffs, relying on this language, argue that the assignment

"did not create an association; it was not an act of persons uniting . . . It did not create an organization or a society." To the contrary, this is precisely what the assignment did. It created a collection of persons—one from each of the associations—who joined together for a certain objective—the oversight and care of the shared Community Areas of the Port Sutton Community.

Finally, plaintiffs assert that an association cannot exist absent a constitution, articles of agreement, bylaws, or rules governing its conduct of business. Plaintiffs rely on MCL 500.2630,[4] which permits various entities, including unincorporated associations, to apply to the insurance commissioner for a license. MCL 500.2630(1). There is no question that MCL 500.2630 requires submission of a constitution, articles of agreement or association, and bylaws and rules governing the conduct of its business, but that is limited to those unincorporated associations that seek to obtain an insurance license. There is no statute or caselaw that requires any particular documents or agreements for an unincorporated association to exist.

Here, the assignment established intent to create a group of people (the informal Board) to manage the declarant's rights and responsibilities which were assigned collectively to all of the associations. The assignment provided a method for choosing the members of the Board— one from each association for equal representation—and provided a method for accounting for every owners' vote—weighted voting by the members of the association equal to the number of dwelling units in the representative member's association. Finally, there was evidence that all of the associations had "co-owner and Board majority approval" of such governance. Under these circumstances, the record supports the trial court's conclusion that the Board was an unincorporated voluntary association.

## C. THE BOARD HAD LEGAL AUTHORITY TO TAKE ACTION

Plaintiffs next argue that even assuming the Board "had any validity" and could be considered an association, the association only had four members based on the express terms of the assignment, precluding the remaining 105 owners from being members of the association. Plaintiffs posit that "[t]here is simply no authority of any kind for the proposition that the members of an 'association' have any right or ability to impose their will or otherwise exercise any authority over people who are not members of that association." Plaintiffs' claim ignores evidence that all of the co-owners in the associations and the boards of those associations expressly approved resolutions "appointing current board members to act on their behalf." Thus, all co-owners received the opportunity to determine whether they agreed with the representative form of governance created in the assignment and, having so accepted, approved resolutions to that effect.

Plaintiffs assert that an association can only derive its authority from its constitution and bylaws and reiterates that no such documents exist in this case, but the cases cited by plaintiffs

---

[4] Plaintiffs actually cite MCL 500.2360 for this premise, but there is no such statute. Presumably, plaintiffs meant MCL 500.2630.

are from 1875 and 1912. Given the lack of more recent authority, we suspect that these cases may well be "vestigial" remnants that no longer have any application given that unincorporated associations are considered legal entities, discussed *supra*. Plaintiffs point to no statute that requires any such documents exist in order for an unincorporated association to take action. Here, the Board derives its existence and representative form of governance from the assignment, and its authority is derived from both the assignment and the resolutions passed by the associations granting the Board the authority to act on their behalf.

Plaintiffs have not presented any authority that suggests that the co-owners and associations could not agree to this form of governance, or that, even in the face of such an express agreement, such authority cannot exist. Indeed, the fact that the Board's actions were uncontested for 17 years is evidence supporting the fact that all of the owners and associations were content with this form of governance and acquiesced to the Board's authority. The trial court properly found that the Board had the legal authority to act on behalf of all of the owners in the associations.

## D. REPRESENTATIVE GOVERNANCE BY AN ASSOCIATION WAS PERMITTED

Plaintiffs assert that, under the terms of the assignment, a non-profit community association was the only organization to which the Declarant could assign its rights. The parties and the trial court all agree that the declaration provided three options to the declarant for assignment of its rights, and that the declarant expressly selected the second of those options. Plaintiffs' argument is that because the second option—"to the condominium associations collectively"—did not expressly include the ability to create any type of organization, the declarant lacked authority to create the Board. However, we agree with defendants and the trial court that the absence of a specific mandate does not prohibit members from agreeing on a form of government that is not specifically required or precluded. By appointing members to the Board and passing resolutions granting it the authority to act in the manner expressed in the assignment, the associations can be deemed to have created the Board as a representative form of government to make the collective governance by the associations as granted in the assignment less wieldy. Construing the facts in this manner, the declarant's lack of express authority to create any organization other than a nonprofit corporation is irrelevant.

Plaintiffs contend that the meeting minutes are "meaningless" because they do not state in what respect or for what purposes the Board is supposed to act on their behalf. To paraphrase from plaintiffs' own brief, it would be impossible to expressly articulate by name all of the purposes for which the Board had been authorized to act. Plaintiffs argue that, even if the meeting minutes were intended to give such authority to the Board, "it would not be effective until such time as the Declaration was amended accordingly, which it never was," but provide no authority for this proposition. Moreover, their argument that no prospective buyer would have notice of this "ratification" and would take their property free of such a claim ignores that both the assignment and the subsequent supplements are all recorded documents which would be within any purchaser's chain of title and would put them on notice of the existence of the Board and its authority to take action on behalf of the associations and their members.

## E. ESTOPPEL

Plaintiffs next argue that the trial court erred when it concluded that plaintiffs were estopped from arguing that the Board had no lawful authority based on plaintiffs' participation in the governance for the last 17 years. Plaintiffs concede that "for many years the Community ran smoothly" and assert that it was only recently, when they were "excluded" and their "input disregarded" that the associations were no longer exercising the Declarant's former rights and duties "collectively." The record reveals that Yacht Village was represented on the Board by Holtz and that they participated in all of the decisions that plaintiffs now seek to repeal. Only during passage of the final supplemental declaration, involving the trimming of trees on the boundary between Bay Cliff and Yacht Village, did plaintiff express anything other than consent. Moreover, Holtz was present at the Board meetings and voted against the supplemental declaration. Thus, plaintiffs were not excluded; Yacht Village was simply out voted.

Plaintiffs contend that the only thing they acquiesced to was "that the rights and duties of the Declarant with respect to the Community were assumed by the Associations collectively." However, plaintiffs fail to explain how the representative government established by the Declarant and adopted by the associations is not collective action. Collective action does not mean, nor does it require unanimity. Collective simply means "denoting a number of persons or things considered as one group or whole" or "involving all members of a group as distinct from its individuals." *Merriam-Webster's Collegiate Dictionary* (2014). Indeed, all owners are still provided with a vote by their representative, and we do not agree with plaintiffs' contention that this form of governance is not collective.

Plaintiffs correctly contend that estoppel requires a party to induce another party to believe facts, for that other party to justifiably rely and act on that belief, and for the other party to be prejudiced if the first party was allowed to deny the existence of those facts. *AFSCME v Bank One*, 267 Mich App 281, 293; 705 NW2d 355 (2005). Plaintiffs assert, however, that Yacht Village did not induce the other associations to believe that the Board had authority, but that Alexander induced all of the associations, Yacht Village included, to believe that fact. Having concluded that the Board did, in fact, have the authority to act, plaintiffs' claim rings hollow. Instead, as the trial court found, Yacht Village, and Holtz as its representative on the Board, acquiesced to the Board assuming the former rights and duties of the Declarant and taking action consistent therewith on behalf of the associations through the votes of the representative members. Plaintiffs admit that they relied on the advice of counsel. That plaintiffs ultimately, and incorrectly, believed that counsel's determination that the Board had authority to act was wrong did nothing to change the fact that they took action consistent the Board having the authority to execute and record supplements to the declaration and took no action contrary to this position for 17 years. As the trial court noted in its opinion, a board member who acquiesces or participates in business transactions may not later challenge the validity of the transactions in court. See *Camden v Kaufman*, 240 Mich App 389; 613 NW2d 335 (2000) (shareholder precluded from contesting merger in court where he approved the transaction). Thus, the trial court did not err in its determination that plaintiffs were estopped from claiming that the Board lacked authority or that the disputed supplements were invalid special assessments.

## F. REMAINING CLAIMS

Plaintiffs' remaining claims regarding the invalidity of the supplemental declarations executed by the Board, the invalidity of the assessments, and alleged breaches of fiduciary duties

by the Board members are all premised on plaintiffs' arguments that the Board was a non-entity without power or authority to act.  Having concluded that the trial court's determinations on the legal existence and authority of the Board and the propriety of estoppel were supported by the record, none of these claims have merit.  Similarly, because plaintiffs' claims against Alexander were premised on their position that the Board was a non-entity that lacked legal authority, the trial court's determination that Alexander made no false, deceptive or misleading statements must be affirmed.[5]

Affirmed.

/s/ Colleen A. O'Brien
/s/ Kirsten Frank Kelly
/s/ Karen M. Fort Hood

---

[5] Having affirmed the trial court's decision, plaintiffs' arguments regarding the trial court's dismissal of its motion for class certification are moot.